**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| | § | |
| | § | |
| IN RE: PARKCENTRAL GLOBAL | § | No. 3:09-cv-765-M |
| LITIGATION | § | |
| | § | |
| | § | |

<u>**MEMORANDUM OPINION & ORDER**</u>

Before the Court is the Motion for Class Certification [Docket Entry #138], filed by

Plaintiffs Southern Avenue Partners, L.P. ("SAP") and Levine Capital Ltd. ("Levine")

(collectively "Plaintiffs"). Plaintiffs request that, under Federal Rule of Civil Procedure 23(a), in

combination with either Federal Rule of Civil Procedure 23(b)(1)(B) or 23(b)(3), the Court

certify a class of all persons who were limited partners in Parkcentral Global, L.P.

("Parkcentral") from July 1, 2007 to November 30, 2008 (the "class period"). For the reasons

stated below, the Motion is **DENIED**.

## I.        BACKGROUND

Plaintiffs are entities who invested as limited partners in Parkcentral, a hedge fund

organized as a Delaware limited partnership. This suit arises out of the total loss of value of

Plaintiffs' interests. Plaintiffs are SAP, a Delaware limited partnership, and Levine, a Texas

limited partnership, both of which invested significant funds in Parkcentral. Defendants are

Steven L. Blasnik and Peter M. Karmin, employees of Parkcentral's general partner, Parkcentral

Capital Management, L.P. ("PCCM"), who Plaintiffs allege breached their fiduciary duties by

making material misrepresentations and omissions to Parkcentral's limited partners.

Parkcentral was the shareholder, sole investment manager, and domestic feeder fund to

Parkcentral Global Hub, Limited (the "Hub Fund"), a Bermuda company through which Parkcentral's investments and trading activities were conducted. PCCM, a Texas limited partnership, was the general partner and investment advisor of Parkcentral and the Hub Fund. The Perot Family Trust wholly owned PCCM and Parkcentral Capital G.P., L.L.C. ("Parkcentral Capital"). Parkcentral Capital is the general partner of PCCM. Petrus Securities, L.P. ("Petrus") was a closed fund for Perot family investments, and it had a direct ownership interest in the Hub Fund and was a limited partner of Parkcentral.

Defendants Blasnik and Karmin were key employees of Perot Investments, which provided management services to PCCM. Blasnik was also the Chief Risk Officer, manager, and director of the Hub Fund, and the president or sole manager of the following entities: PCCM, Parkcentral Capital, Perot Investments, and other Perot entities. Karmin was the Head of Trading for the Hub Fund, PCCM, and Perot Investments.

Parkcentral was formed in 2002 to provide outside investors access to the Perot family's money management team and proprietary trading strategies. Prospective investors in Parkcentral reviewed a confidential Private Placement Memorandum ("PPM"), which contained detailed information about becoming a limited partner in Parkcentral, including the risks of doing so. Defs.' Resp., App. (Dkt. No. 198) Ex. 13 at 434-70. Plaintiffs and each member of the purported class executed a Subscription Agreement and became a limited partner in Parkcentral, subject to the terms of the Limited Partnership Agreement. *See, e.g.*, Defs.' Resp., App. (Dkt. No. 198) Ex. 14 at 471-98, (Dkt. No. 204) Ex. 248 at 11076-118. The Subscription Agreement and PPM limited the investment opportunity to accredited investors, who generally had to invest at least $5,000,000.[1] Defs.' Resp., App. (Dkt. No. 198) Ex. 13 at 430, 434-34, Ex. 14 at 471-98.

---

[1] PCCM could permit a lower minimum investment in special cases.

Plaintiffs completed Purchaser Suitability Questionnaires, verifying that they had knowledge and experience in financial and business matters that made them capable of evaluating the merits and risks of the investment. *See, e.g.*, Defs.' Resp., App. (Dkt. No. 198) Ex. 14 at 485-91.

The PPM stated that Parkcentral used sophisticated trading methods and risk management controls. Defs.' Resp., App. (Dkt. No. 198) Ex. 13 at 440. Plaintiffs allege that the Due Diligence Questionnaire ("DDQ"), which Plaintiffs did not submit to the Court, stated that investments would be diversified, and that the worst case loss estimate for any single strategy would not exceed 5% of Parkcentral's net asset value. Plaintiffs also allege that the DDQ stated that Parkcentral's managers would conduct an exhaustive analysis of each potential investment, that Parkcentral would maintain large amounts of cash, and that the manager of Parkcentral would exit a position "if the long term attractiveness of an investment is jeopardized." Pls.' 2d. Am. Compl. ¶¶ 49-53. However, the PPM states that the general partner of Parkcentral, PCCM, had the freedom to concentrate in a limited number of investments, and there was no internal limit on the leverage Parkcentral could assume. Defs.' Resp., App. (Dkt. No. 198) Ex. 13 at 440, 446-47. Although Plaintiffs contend that the DDQ stated that Parkcentral would be trading *pari passu* with Petrus,[2] the PPM stated that Petrus would pursue certain positions that Parkcentral would not. Defs.' Resp., App. (Dkt. No. 198) Ex. 13 at 442. In contrast to Parkcentral, Petrus did not suffer a total loss.

Plaintiffs assert that Parkcentral's positions were not hedged, which exposed Parkcentral to higher risk than that represented to investors. In the Second Amended Complaint, Plaintiffs cite (but did not submit to the Court) a March 2, 2007 letter "to investors" from Blasnik and Karmin, which they claim stated that Parkcentral was pursuing a "credit arbitrage" strategy with

---

[2] In other words, Parkcentral would invest in the same securities in an equal proportion to Petrus's investments.

respect to its investments in commercial mortgage-backed securities ("CMBS").[3] Monthly and quarterly reports prepared by PCCM represented that Parkcentral was pursuing a hedged investment in the spread between a long position in AAA-rated CMBS and a short position in lesser grade A/BBB-rated CMBS. However, Plaintiffs assert that Parkcentral did not hedge its positions, and instead pursued a highly leveraged, open-long position in AAA CMBS, which made Parkcentral dependent on the value of AAA CMBS. In November 2008, the AAA-rated positions in the CMBS market were devalued by 10%, and Parkcentral then incurred a $2-3 billion loss. Plaintiffs allege that those losses would not have occurred had the long position been hedged, as PCCM allegedly represented it would be. Plaintiffs assert that had PCCM, through its agents, Blasnik and Karmin, not misrepresented the nature of Parkcentral's investments, Plaintiffs and other limited partners would have redeemed their positions in Parkcentral, and avoided the loss of the value of their limited partnership interests.

In its July 26, 2012 Order, the Court dismissed the majority of Plaintiffs' claims, but allowed Plaintiffs to proceed on their claims that Blasnik and Karmin breached their fiduciary duties by misrepresentation and/or non-disclosure.

## II.     LEGAL STANDARD

### A.     Class Certification

Federal Rule of Civil Procedure 23 governs whether a proposed class action can proceed as such. The party seeking certification must prove that the proposed class meets all requirements. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996). To do so, the proponent must show that the class satisfies all the requirements in fact; this is not a "mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011).

---

[3] This letter is excerpted in the Second Amended Complaint at Paragraph 60.

Under Rule 23(a), the party seeking certification must demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

The proposed class must also satisfy at least one of the three requirements of Rule 23(b). *Dukes*, 131 S. Ct. at 2549. Plaintiffs rely on Rule 23(b)(1)(B), which requires a finding that adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of others who would not be parties to those individual adjudications or would substantially impair or impede the ability of non-parties to protect their interests. In the alternative, Plaintiffs rely on Rule 23(b)(3), contending that questions of law or fact common to the class predominate over questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

To conduct the necessary analysis under Rule 23, the Court must consider the "relevant claims, defenses, facts, and substantive law presented in the case." *Funeral Consumers Alliance, Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 345 (5th Cir. 2012). The Supreme Court has repeatedly stated that it "may be necessary for the [trial] court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if after rigorous analysis, the court confirms the presence of Rule 23's prerequisites. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) (internal quotations omitted); *General Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-161 (1982)).

## B.      Breach of Fiduciary Duty Due to Misrepresentation

When a plaintiff alleges a breach of fiduciary duty based on misrepresentation of a

5

corporation's financial condition, not made in connection with a request for shareholder action, the following must be shown by the claimant: (1) deliberately false or misleading information was either given directly to shareholders, or through public statements; (2) reliance; (3) causation; and (4) actual, quantifiable damages. *Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 389 (5th Cir. 2009) (citing *Malone v. Brincat*, 722 A.2d 5, 14 (Del. 1998)).

### III.    ANALYSIS

#### A.    Rule 23(a)

Certification is appropriate only where "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no precise minimum number of class members required to satisfy the numerosity requirement. *In re TWL Corp.*, 712 F.3d 886, 894 (5th Cir. 2013); 7A Charles Alan Wright et al., Federal Practice and Procedure § 1762 (3d ed. 2005) (identifying cases in which numerosity was satisfied with as few as 25 putative class members, but not satisfied with as many as 350). The critical inquiry is not whether there are sufficient class members, but whether joinder of them in a lawsuit is impracticable. To make this determination, courts turn to several factors, including "size of the class, ease of identifying members and determining their addresses, . . . and their geographic dispersion." *Garcia v. Gloor*, 618 F.2d 264, 267 (5th Cir. 1980).

Despite Plaintiffs' argument that the number of putative class members alone suggests that Plaintiffs' purported class meets the numerosity requirement, the Fifth Circuit has emphasized that "the number of members in a proposed class is not determinative" in this analysis. *Id.*; *In re TWL Corp.*, 712 F.3d at 894. Courts must not "focus on sheer numbers alone[,]" *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000), but rather must

6

assess more generally whether joinder would be impracticable. *In re TWL Corp.*, 712 F.3d at 894 (quoting *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981)).

The Court concludes that Plaintiffs have not shown that the size and membership of the purported class satisfies the numerosity requirement. Plaintiffs estimate that there are approximately 130 potential class members, who were limited partners in Parkcentral during the class period. Pls.' Mot., App. (Dkt. No. 139) Ex. 1 at 1-13 (Domestic Fund Details, Jan. to Feb. 2007). Defendants contend that there were only 112 limited partners during the relevant period.[4] Defs.' Resp., App. (Dkt. No. 204) Ex. 286 at 11610, 11675, 11690 (2008 Fee and Net Asset Value Calculation Workbook).

Defendants argue that eighteen of the limited partners should be excluded from the class because they fully redeemed their investments before Parkcentral collapsed, and thus suffered no damages, that three more limited partners should be excluded because they invested too late to possibly redeem before the collapse.

Accordingly, there are 112-130 potential class members, excluding those who did not pay fees. The difference between 112 and 130 is not significant to the Court, and would not change the Court's analysis. Of the potential class members, joinder *is* practical. These individuals and entities are substantial, sophisticated parties, many of whom were represented by common advisors, and all of whose names and contact information can be easily ascertained. Defs.' Resp., App. (Dkt. No. 204) Ex. 362 at 12089 (Radunsky Decl.); *see In re TWL Corp.*, 712 F.3d 886,

---

[4] Defendants argued that an additional fourteen limited partners should be excluded because they did not pay fees to Defendants and that, as a result, Defendants did not owe them any fiduciary duties. *Id.*; Defs.' Resp., App. (Dkt. No. 204) Ex. 362 at 12090 (Radunsky Decl.) (stating that Defendants waived fees for "14 of the 115 investors who had an interest in Parkcentral" during the class period). At the class certification hearing, the Court accepted Plaintiffs' modification of the proposed class definition to exclude Parkcentral investors who did not pay fees. Tr. Hr'g Mot. Class Cert. (Dkt. No. 256), Nov. 21, 2013, 78:18-23.

895 (5th Cir. 2013) ("[A] putative class with only 130 members . . . might present a close question as to numerosity[.]"); *Jaynes v. United States,* 69 Fed. Cl. 450, 454–55 (Fed. Cl. 2006) (finding that a class with as many as 258 putative members failed to satisfy numerosity because the class members all had a connection to the same area and could easily be identified and located).

Plaintiffs have not presented persuasive evidence that joinder would be impractical. Plaintiffs contend they "are aware of at least one class member who resides outside the state of Texas, and there are surely more," but do not support this assertion with proof. Pls.' Reply 28. There is no evidence of significant geographic diversity among purported class members, or that any such diversity effectively precludes joinder. *See Dukes*, 131 S. Ct. at 2551. Plaintiffs concede that "most of the absent class members are Texas citizens." Pls.' Supp. Br. 3. The limited partners were sophisticated investors of substantial means, all of whom interacted, directly or through investment advisors, with a Dallas company, and who presumably could similarly act, individually, through lawyers in a Dallas lawsuit. Accordingly, the Court holds that the putative class does not satisfy the numerosity requirement of Rule 23(a). *Jaynes*, 69 Fed. Cl. at 454-55.

Because Plaintiffs cannot demonstrate numerosity, they cannot satisfy Rule 23(a). Thus, the Court need not reach the other factors of Rule 23(a). Because the Court regards the Rule 23(b) issues as dispositive even if Rule 23(a) were satisfied, the Court will address the Rule 23(b) issues.

## B.     Rule 23(b)

Even if Plaintiffs satisfied Rule 23(a), they are unable to satisfy any of the alternative requirements for class certification under Rule 23(b). Plaintiffs maintain that they meet the Rule

23(b)(1)(B) requirement or, in the alternative, the Rule 23(b)(3) requirement.

**1.      Rule 23(b)(1)(B)**

To meet the requirements of Rule 23(b)(1)(B), Plaintiffs must show that "adjudications with respect to individual class members, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede the ability of non-parties to protect their interests . . . ." The Supreme Court has discouraged utilizing "the potential for creativity" under this rule, holding that the intent behind the rule was to "capture the 'standard' class actions recognized in pre-Rule practice" rather than to permit "innovative" uses of the rule. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999). Courts in this district have interpreted this mandate as an "admonish[ment to] lower courts to read Rule 23(b)(1)(B) itself narrowly because the object was to stay close to the historical model." *Klein v. O'Neal, Inc.*, No. 7:03-CV-102-D, 2006 WL 325766, at *4 (N.D. Tex. Feb. 13, 2006) (Fitzwater, J.); *see also Stott v. Capital Fin. Servs., Inc.*, 277 F.R.D. 316, 339 (N.D. Tex. 2011) (Furgeson, J.). The Supreme Court described the historical model for Rule 23(b)(1)(B) as including "claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit, and others[.]" *Ortiz*, 527 U.S. at 834 (quotation omitted). In *Dukes*, the Supreme Court emphasized that it was "clear that individualized monetary claims belong in Rule 23(b)(3)." *Dukes*, 131 S. Ct. at 2558.

While a claim for breach of fiduciary duty by managers of a private hedge fund does not fit into one of the traditional categories of claims under Rule 23(b)(1)(B), Plaintiffs make two principal arguments in support of their position that their suit nevertheless qualifies for class status under Rule 23(b)(1)(B). First, Plaintiffs argue that Defendants breached their fiduciary duties through a common course of conduct, *i.e.*, misrepresentations and omissions made to all

members of the putative class, such that individual dispositions risk prejudicing potential class members who would not be party to other members' individual actions. Plaintiffs argue that, therefore, common issues like whether Defendants were fiduciaries, the extent of Defendants' duties to the limited partners, and whether Defendants breached those duties, would be adjudicated with the same evidence for all members of the putative class. Plaintiffs also contend that the similar nature of claims that would be brought by limited partners in individual actions would mean that an action  brought by one limited partner would run the risk of a disposition that would prejudice other putative class members not parties to those actions. In other words, Plaintiffs maintain that, particularly with respect to the issue of whether Defendants owed fiduciary duties to the limited partners, the holdings in one suit would bind later courts adjudicating related suits, whose litigants would be bound by a decision based on proceedings in which they took no part.

The Court will address the "common issues" matter where it belongs, in the Rule 23(b)(3) analysis below. As to claim preclusion, the Court disagrees that it should materially impact this analysis. Factual findings against some limited partners are not binding on other limited partners in subsequent different actions. *Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379 (2011); *Taylor v. Sturgell*, 553 U.S. 880, 898 (2008). The Supreme Court has repeatedly emphasized the "fundamental nature of the general rule that only parties can be bound by prior judgments; accordingly, [it] ha[s] taken a constrained approach to nonparty preclusion." *Smith*, 131 S. Ct. at 2379 (internal quotation marks omitted); *Taylor*, 553 U.S. at 898. Although the Defendants could be bound by adverse findings against them, the Plaintiffs could not be. *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313 (1971); *U.S. v. Shanbaum,* 10 F.3d 305, 310 (5th Cir. 1994). Therefore, the fact that cases brought by individual limited

partners would have some common issues concerning whether Defendants owed fiduciary duties

does not justify class certification under Rule 23(b)(1)(B).

Second, Plaintiffs argue that this is a "limited fund" case, because there is a "definite,

limited amount of capital that is available to class members, and that such a fund is insufficient

to cover all claims." *Stott*, 277 F.R.D. at 326. Plaintiff contends that limited fund cases are

cognizable under Rule 23(b)(1)(B).

A proper "limited fund" case requires:

> (1) the totals of the aggregated liquidated claims and the fund
> available for satisfying them, set definitely at their maximums,
> demonstrate the inadequacy of the fund to pay all claims; (2) the
> whole of the inadequate fund is to be devoted to the overwhelming
> claims; and (3) the claimants identified by a common theory of
> recovery are treated equitably among themselves.

*Id*. at 327 (citing *Ortiz*, 527 U.S. at 838-39). Plaintiffs present evidence that that the total

capital of Parkcentral at the beginning of 2007 was more than $500 million, which was depleted

to zero at the time of its collapse, and that Defendants admitted that there would be no assets

remaining in Parkcentral for distribution to investors after eventual satisfaction of the debt to

creditors. Pls.' Mot., App. (Dkt. No. 139) Ex. 1 at 13 (Domestic Fund Details, Jan. to Feb. 2007),

Ex. 5 at 118-19 (email from Parkcentral to Lee Financial Corporation ("LFC"), Levine's

financial advisor). Plaintiffs urge that since there is no insurance or indemnification available to

satisfy their claims, the "fund" available to satisfy the claims of the purported class members is

limited to Defendants' personal assets. Pls.' Mot., App. (Dkt. No. 139) Ex. 6 at 125 (Blasnik and

Karmin's initial disclosures). Plaintiffs assert, but offer no proof, that the entirety of Defendants'

assets would be expended to satisfy a judgment for even part of the putative class's claims,

which they contend exceed $500 million, in a judgment against them.

The Court rejects Plaintiffs' argument that this analysis makes this a limited fund case. In

*Ortiz*, the Supreme Court specified that limited funds were only those that were pre-existing, such as trust assets or a bank account, not the personal assets of defendants. *Ortiz*, 527 U.S. at 834-37. Defendants' assets are not a limited fund within one of the historical models to which the Supreme Court has specifically limited Rule 23(b)(1)(B)'s application. Were the Court to accept Plaintiff's argument, conceivably any case where a defendant's assets are not sufficient to satisfy a judgment against the defendant would be a limited fund, and on that basis, a case could be certified as a class action. Rule 23(b)(1)(B) requires more.

Further, Plaintiffs have not shown that Defendants' assets, considering their earning capacities over the life of a potential judgment, would be insufficient to satisfy Plaintiffs' claims. *Doe v. Karadzic*, 192 F.R.D. 133, 141 (S.D.N.Y. 2000) (holding that where the defendants are individuals rather than corporate entities, "plaintiffs must establish not only that the defendant's current net worth is insufficient to satisfy a potential judgment, but also a substantial probability that the defendant will be unable to pay such claims over the life of the judgment") (quotation omitted). While the lifetime earning capacity for very few individuals exceeds the more than $500 million dollars the Plaintiffs seek, the fact that a judgment could conceivably be uncollectible does not create a limited fund under Rule 23(b)(1)(B). *Ortiz*, 527 U.S. at 843 ("The original concept of the limited fund class does not readily fit the situation where a large volume of claims might eventually result in judgments that in the aggregate could exceed the assets available to satisfy them.") (quoting William W. Schwarzer, *Settlement of Mass Tort Class Actions: Order Out of Chaos*, 80 Cornell L. Rev. 837, 840 (1995)). The Court concludes that the facts here do not fall with within one of the historical models for Rule 23(b)(1)(B), and that this is not a limited fund case. *See id.* at 834. Plaintiffs' claims, therefore, must be evaluated under Rule 23(b)(3).

### 2.      Rule 23(b)(3)

Rule 23(b)(3) requires that questions of law or fact common to all class members

predominate over any questions affecting only individual members, and that a class action be

superior to other available methods for fairly and efficiently adjudicating the controversy. While

the existence of even one common question can satisfy the commonality inquiry under Rule

23(a)(2), the Rule 23(b)(3) predominance inquiry "is more demanding," testing "whether

proposed classes are sufficiently cohesive to warrant adjudication by representation." *Ahmad v.

Old Republic Nat. Title Ins. Co.*, 690 F.3d 698, 703 (5th Cir. 2012) (citations omitted). A court

must consider how the case will be tried on the merits if the class is certified, "identifying the

substantive issues that will control the outcome, assessing which issues will predominate, and

then determining whether the issues are common to the class." *Id.*; *Madison v. Chalmette

Refining, L.L.C.*, 637 F.3d 551 (5th Cir. 2011). The Court concludes that this case raises

pervasive individual questions pertaining to the content of information received, reliance, and

damages, such that class treatment would be inappropriate.

### a.      Predominance

#### i.      Did Plaintiffs Owe Fiduciary Duties to the Limited Partners?

The Court previously held that "Blasnik and Karmin, by virtue of their positions with

PCCM, have a fiduciary duty not to act to benefit themselves at Parkcentral's expense." *In re

Parkcentral Global Litig.*, No. 3:09-CV-0765-M, 2010 WL 3119403, at *12 (N.D. Tex. Aug. 5,

2010) (Lynn, J.); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658–VCS,

2009 WL 1124451, at *1, *9-10 (Del. Ch. Apr. 20, 2009) (denying a motion to dismiss a breach

of fiduciary duty claim against an individual who was neither a member nor an officer of a

limited liability company, but exercised control over that company for his personal benefit). At

13

the class certification hearing, Defendants conceded that, since Plaintiffs modified their

definition of the putative class to exclude Parkcentral investors who did not pay fees, this issue is

common to the putative class members. Tr. Hr'g Mot. Class Cert. (Dkt. No. 256), Nov. 21, 2013,

78:18-79:20; Defs.' Supp. Br. 5.

        **ii.**        **Did Defendants Deliberately Convey False or Misleading**
                        **Information to Class Members?**

Plaintiffs argue that common issues predominate with respect to this question because all

of Plaintiffs' claims arise from alleged misrepresentations and omissions in reports sent to the

limited partners. *See Durrett v. John Deere Co.*, 150 F.R.D. 555, 560 (N.D. Tex. 1993) (Kendall,

J.) (finding that common issues predominated because all questions of law and fact arose from

contracts that were "similar if not identical"); *Walton v. Franklin Collection Agency, Inc.*, 190

F.R.D. 404, 412 (N.D. Miss. 2000) (finding that common issues predominated "[g]iven the

apparent standardized nature of the [d]efendant's debt collection activities" such that "individual

factual or legal issues that may arise will be secondary to the common questions concerning the

[d]efendant's alleged course of conduct and its unlawfulness"). However, Defendants respond

that differences in the communications received by the limited partners, and what they did with

them, create individualized issues that counsel against certifying the putative class.

The parties dispute whether the same materials containing Defendants' alleged

misrepresentations were distributed to all of the limited partners. Plaintiffs contend that the

materials were distributed to all of them, and were the only information that the limited partners

had to rely on in making decisions regarding their investments in Parkcentral. Plaintiffs present

evidence that it was the regular practice for Defendants to send periodic letters, reports, and

updates to each limited partner, as part of Defendants' management of Parkcentral through

PCCM, and that these communications were uniform in substance, if not always in form. Pls.'

Mot., App. (Dkt. No. 139) Ex. 7 at 128-93 (Parkcentral quarterly reviews), Ex. 8 at 194-225

(Parkcentral monthly reviews); Defs.' Answer ¶¶ 2, 55, 60, 75-77, 79, 85, 87-88. Plaintiffs

emphasize that since Parkcentral did not file public documents, these communications were the

only sources of information available to them, and thus they contend that the limited partners

necessarily, and exclusively, relied on these materials.

Defendants respond that there was not uniformity in their communications to the limited

partners, but rather, that different investors received varying information, by different means, and

that whether an investor received false or misleading information on which the investor relied

can only be determined on an individual basis. Defendants present evidence that while common

information was *available* to all investors, what information investors in fact accessed differed,

and that some investors chose not to receive the periodic reports or merely had them sent to their

own financial advisors. *See, e.g.*, Defs.' Resp., App. (Dkt. No. 198) Ex. 1 at 21-23 (LFC Dep.)

(A principal of LFC, Levine's financial advisor, acknowledged that LFC received periodic

updates from Parkcentral on Levine's behalf, but did not generally forward them to Levine), Ex.

2 at 105 (Levine Dep. 15-25) (Levine principal acknowledged that Levine and LFC did not

discuss any specific risk estimates in Parkcentral's periodic updates). (Dkt. No. 199).

In some instances, even where a financial advisor for a limited partner had full discretion

to act on behalf of a limited partner, the advisor could not make a contribution or redemption

without tendering a signature by the investor, and thus, ultimately, only the limited partner could

decide whether to invest in or withdraw from a hedge fund. Defs.' Resp., App. (Dkt. No. 198)

Ex. 1 at 9 (LFC Dep.) (LFC stated that with respect to hedge funds, "ultimately [the client] ha[s]

to make that call"); Ex. 2 at 94 (Levine Dep.) (confirming that Levine does not always follow

LFC's recommendations). Thus, the extent to which limited partners, not just their financial

advisors, received periodic updates bears on the central questions in the case, as does the issue of whether they relied on their advisors in addition to, or instead of, Parkcentral.

Defendants also present evidence that only a subset of investors listened to Parkcentral's quarterly calls, which Defendants contend provided greater detail than Parkcentral's quarterly reports. Defs.' Resp., App. (Dkt. No. 199) Ex. 72 at 1069 (email noting that only fifty investors and advisors participated in Parkcentral's quarterly call for the second quarter of 2008), (Dkt. No. 200) Ex. 87 at 1235-89, (Dkt. No. 202) Ex. 246 at 11065, (Dkt. No. 204) Ex. 307 at 11775-83 (emails from limited partners and investment advisors to Parkcentral discussing Parkcentral's quarterly calls). Defendants present evidence that PCCM held annual meetings that also went into further detail concerning Parkcentral's strategies, but that many investors, including Levine and LFC, skipped annual meetings. Defs.' Resp., App. (Dkt. Nos. 199, 200) Exs. 78-79 at 1089-1159 (presentations from 2006 and 2007 annual meetings), (Dkt. No. 204) Ex. 360 at 12071 (Blasnik Decl.), Ex. 361 at 12082 (Karmin Decl.).

Defendants also offer evidence that Parkcentral had an "open door" policy where investors were encouraged to, and did, ask questions of Parkcentral's representatives and then received individualized responses. Defs.' Resp., App. (Dkt. No. 199) Ex. 33 at 802-13, (Dkt. No. 204) Ex. 331 at 11963, Ex. 357 at 12062-63 (emails from limited partners scheduling calls and asking for more information from Parkcentral), Ex. 360 at 12068-71 (Blasnik Decl.), Ex. 361 at 12080-85 (Karmin Decl.). Some investors, like SAP, took advantage of this policy. Defs.' Resp., App. (Dkt. No. 200) Ex. 90 at 1294-99, (Dkt. No. 204) Ex. 265 at 11520-25, Ex. 321 at 11837-40 (emails between SAP and Karmin). Others, like Levine and LFC, did not. Defs.' Resp., App. (Dkt. No. 204) Ex. 361 at 12084 (Karmin Decl.). There are thus individual differences in the amount and type of information received among even the two named Plaintiffs. Defs.' Resp.,

App. (Dkt. No. 198) Ex. 5 at 241 (SAP's Suppl. Resp. to Defs.' First Interrogs.), Ex. 7 at 275 (Levine's Suppl. Resp. to Defs.' First Interrogs.).

Defendants also present evidence that the representations allegedly made,[5] were high-level and generic, and provided only general descriptions of Parkcentral's CMBS positions, while some limited partners received much more specific information on a regular basis, such as monthly listings of each trade in Parkcentral, individual communications about CMBS trades, and other detailed information about Parkcentral's strategies. *See, e.g.*, Defs.' Resp., App. (Dkt. Nos. 200-202) Exs. 211-243 (excerpts of data uploads of all Hub Fund positions sent to investors from January 1, 2008–September 8, 2008), (Dkt. No. 204) Ex. 259 at 11506 (notes of phone call between SAP and Parkcentral), Ex. 355 at 12050-52 (email from Parkcentral to SAP). Defendants also present evidence that investors requested, and received, individualized information about liquidity and risk in Parkcentral, as well as on other topics. Defs.' Resp., App. (Dkt. No. 204) Ex. 331 at 11963-65 (email between limited partner and Parkcentral).

In light of the evidence of significant differences in the amount and substance of information received by the limited partners, the Court finds that individualized questions as to the receipt of false or misleading information by the investors will predominate over common questions.

### iii.     Did the Limited Partners Rely on Defendants' Allegedly False or Misleading Representations?

Even if the issue of individual false representations did not predominate, there is a significant issue of lack of common facts as to reliance. Plaintiffs maintain that they are entitled

---

[5] They are, in part, that "Parkcentral Global has a substantial book of long AAA and short A/BBB CMBS" and "own[s] AAA commercial mortgage-backed securities versus lower rated CMBS." Defs.' Resp., App (Dkt. No. 204) Ex. 322 at 11841 (Parkcentral Global Quarterly Review for Q4 2007), Ex. 359 at 12066 (November 2007 Preliminary Results for Parkcentral).

to a rebuttable presumption of reliance because hedge funds like Parkcentral offer a closed

universe of information to their investors, and thus "it is logical to presume that reliance in fact

existed." *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 131 (S.D.N.Y. 2001) ("*Cromer I*")

(quotation omitted); *see In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212, 220

(N.D. Tex. 2000) (Kendall, J.) (holding that plaintiffs in a consumer class action were entitled to

a presumption of reliance where the complaint alleged defendant failed to disclose, or

misrepresented, information related to material facts defendant was required to disclose).

     In *Cromer I*, a hedge fund manager made misrepresentations about the fund's net asset

value. 205 F.R.D. at 131. The *Cromer* court held that even though the securities involved were

not traded on an efficient market, which is the basis for the fraud on the market theory, "there

c[ould] be no credible argument that any one of the[ ] investors would have invested in the Fund

if the investor had understood [the hedge fund manager] was 'cooking the books,' . . . ." *Id.*

Plaintiffs urge that the fraud on the market theory is premised upon reliance on the integrity of a

process, and that limited partners should similarly be presumed to rely on the integrity of the

process of receiving information from the Defendants. Pls.' Mot., App. (Dkt. No. 139) Ex. 10 at

293 (Steinholt Decl.).

     Defendants dispute the applicability of *Cromer I* to these facts, arguing that no other

federal court has adopted its reasoning concerning a presumption of reliance in an efficient

market, that the case did not involve the law applicable here, which is Delaware law, and that

Delaware cases frequently find that individual reliance issues in misrepresentation cases

"inevitably predominate over common questions." *Dubroff v. Wren*, 2010 WL 3294219, at *6

(Del. Ch. Aug. 20, 2010). In fact, Delaware has explicitly rejected the notion of a rebuttable

presumption of reliance for "fraud on the market"-type claims. *Malone v. Brincat*, 722 A.2d 5,

13 (Del. 1998) ("[T]his Court has decided not to recognize a state common law cause of action . . . for 'fraud on the market.'"); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *4 (Del. Ch. Dec. 19, 2002) ("Plaintiff cannot rely on a presumption of reliance based on a type of 'fraud on the market' theory because the Supreme Court has determined that Delaware does not recognize such a claim.").

Plaintiffs concede that the fraud on the market theory's presumption of reliance cannot apply here because they "don't have an efficient market . . . public information . . . [or] a situation where the information affects the price in the sense that you would with a publicly-traded company." Tr. Hr'g Mot. Class Cert., Nov. 21, 2013, 20:3-10. Nevertheless, Plaintiffs contend they are entitled to a presumption of reliance because they are asserting actionable nondisclosures, and that the closed universe of information received from Defendants thus warrants such a presumption.

Under Delaware law, "in breach of fiduciary duty cases based on omissions, Delaware has limited the presumed reliance principle to cases where shareholder or partner action is requested." *Anglo Am. Sec. Fund, L.P. v. S.R. Global Intern. Fund, L.P.*, No. 20066-N, 2006 WL 1494360, at *3 (Del. Ch. May 24, 2006). "As the Delaware Supreme Court made clear . . . if a complaint does not allege statements made to shareholders in conjunction with a request for shareholder action, a plaintiff cannot rely on a 'rebuttable presumption of reliance.'" *Id.* (citing *Malone*, 722 A.2d at 14). In a subsequent opinion, the court in *Cromer* held the plaintiff could not "rely on a presumption of reliance in connection with . . . their common law claims . . . . [because] to the extent a common law claim requires proof of reliance, 'actual' reliance must be shown." *Cromer Fin. Ltd. v. Berger*, 2003 WL 21436164, at *13 (S.D.N.Y. June 23, 2003) (*"Cromer II")*. This Court concludes class members would not be entitled to a presumption of

reliance under Delaware law.

Even in the absence of a presumption, Plaintiffs argue that common questions predominate with respect to the issue of reliance, because the members of the purported class will use common evidence to prove reliance. Plaintiffs cite to *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 724 (11th Cir. 1987), in which the defendants "disseminat[ed] materially misleading information" concerning the financial condition of a company in which the plaintiffs had purchased limited partnership interests, and since the plaintiffs had alleged "a single conspiracy and fraudulent scheme against a large number of individuals[,]" the court held that "the factual issue of individual reliance could not render the claims unsuitable for class treatment." *See also Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004) (finding that individual issues did not predominate where circumstantial evidence could be used to show that reliance was common to the whole class).

Defendants respond that because different investors had different goals and risk tolerances, whether the limited partners would have redeemed, rather than continued to hold, their investments in Parkcentral if they had been informed about Parkcentral's investment strategy remains an individualized issue that cannot be proven by common evidence. In support of this position, Defendants present evidence that during the class period, some investors redeemed in part, others redeemed in full, and others invested more capital in Parkcentral. Defs.' Resp., App. (Dkt. No. 204) Ex. 249 at 11119-454 (2007 Fee and Net Asset Value Calculation Workbook), Ex. 286 at 11595-719 (2008 Fee and Net Asset Value Calculation Workbook), Ex. 362 at 12098 (Radunsky Decl.).

Defendants point to the deposition of Nathan Levine, of Levine Capital Ltd., who conceded that he "can't say what he would have done" had he known more about PCCM's

investment strategy, and also that Levine and its agents knew, based on the January 2008 Risk Summary Report, that more than 10% of Parkcentral's capital was at risk on the credit derivatives strategy, but that Levine still chose not to redeem. Defs.' Resp., App. (Dkt. No. 198) Ex. 2 at 90-91, 111-12 (Levine Dep.).

In fact, certain investors in the purported class encouraged Defendants to take on more risk and/or wanted greater investment in CMBS. Defs.' Resp., App. (Dkt. No. 204) Exs. 270-71 at 11562-64 (emails noting that some limited partners sought the creation of a CMBS-only fund), Ex. 279 at 11574 (email from limited partners stating that they "like [CMBS trades] and want more" and might seek out other avenues to accommodate this preference if Parkcentral did not), Ex. 334 at 11992 (email stating that limited partner "thinks [Parkcentral] should've loaded the boat with the CMBS trade"), Ex. 336 at 11995 (email from limited partner to Karmin).

The differing views of limited partners, including on whether they found AAA CMBS positions appealing, suggest that reliance cannot be presumed for the putative class as a whole. Because of the different investor views as to the advisability of Parkcentral's trading strategy, it is speculative to assume that the investors would have taken a uniform course of action had they had different information, and accordingly, the extent to which they relied on Defendants' communications in deciding not to redeem is one that requires individual analysis. "[A] fraud class action cannot be certified when individual reliance will be an issue." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996). "If the circumstances surrounding each plaintiff's alleged reliance on fraudulent representations differ, then reliance is an issue that will have to be proven by each plaintiff, and the proposed class fails Rule 23(b)(3)'s predominance requirement." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005).

Because there are individualized issues as to what information different limited partners received, and the extent to which they relied on such information, common issues do not predominate. *See Turnbow v. Life Partners, Inc.*, No. 3:11-CV-1030-M, 2013 WL 3479884, at *18 (N.D. Tex. July 9, 2013) (Lynn, J.) (holding that reliance was a barrier to certification where "individual investors would have to prove reliance on [the defendant's] alleged misrepresentation or omission" and accordingly there would have to be a multitude of "mini-trials to prove whether class members would have made purchases and for what amount had they received more information . . . ."); *Dukes,* 131 S. Ct. at 2552 n.6.

### iv.      Did Defendants' Alleged False or Misleading Representations Cause the Limited Partners' Alleged Losses?

The same evidence and reasoning with respect to the reliance factor are applicable to the issue of causation. Essentially, it would be speculative to say whether the limited partners would have held or redeemed their investments in Parkcentral if they had received different information, given the variances in information received by investors, as well as the investors' different goals and tolerances. Accordingly, common issues do not predominate with respect to whether Defendants' alleged misrepresentations caused the putative class members' asserted damages.

### v.       Did the Limited Partners Suffer Damages?

The Fifth Circuit has held that "differences among the members [of a class] as to the amount of damages incurred does not mean that a class action would be inappropriate." *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 307 n.17 (5th Cir. 2003). While damage calculations need not be exact, at the class certification stage, as at trial, any model supporting a "plaintiff's damages case must be consistent with its liability case" and damages must be capable of determination on a class-wide basis. *Comcast Corp.*, 133 S. Ct. at 1433 (internal quotations

omitted). For purposes of Rule 23, courts must conduct a rigorous analysis to determine whether that is so. *Dukes*, 131 S. Ct. at 2551-52. .

Plaintiffs argue that the damages sought by the purported class are based on a common methodology. Plaintiffs offer the declaration of Bjorn I. Steinholt, CFA, who provides an expert opinion as to how to calculate potential damages on a class-wide basis in this case. Pls.' Mot., App. (Dkt. No. 139) Ex. 10 at 290-99 (Steinholt Decl.). Under Plaintiffs' proposed methodology, the damages are measured on a "benefit-of-the-bargain" theory, *i.e.*, by the difference between the value the limited partners' investments would have had without the false or misleading representations or omissions, and the value of the investments assuming the truth of the false statements or material omissions. 2d. Am. Compl. ¶ 168. Plaintiffs argue that while different experts may reach different results under this methodology depending on their valuation of Parkcentral, the methodology itself is the same across the putative class, and thus individualized issues of damages do not defeat predominance. Pls.' Mot., App. (Dkt. No. 139) Ex. 10 at 293-94.

Defendants respond that the "benefit-of-the-bargain" damages theory is not capable of determining the putative class members' damages on a class-wide basis, because it does not take into account whether and when investors would have redeemed. Defendants present evidence that there were different penalties for redemption, depending on when the limited partners purchased their investments and what class of shares they purchased, and that some investors specifically scheduled the timing of their redemptions to avoid penalties. *See, e.g.*, Defs.' Resp., App. (Dkt. No. 204) Exs. 251-53 at 11457-63 (communications between limited partners and Parkcentral), Ex. 362 at 12097 (Radunsky Decl.). Accordingly, Defendants argue that individual issues still predominate with respect to damages, for the same reasons that individual issues predominate with respect to reliance.

Defendants also argue that Plaintiffs' benefit-of-the-bargain damages theory is improper, because there were no formal limits for Parkcentral's diversification or leverage, and that because PCCM had "complete discretion to change strategies and investments[,]" there was no one strategy that the limited partners could reasonably expect to be pursued. Defs.' Resp., App. (Dkt. No. 198) Ex. 1 at 36 (LFC Dep.), Ex. 13 at 434, 439, 447, 451, 453 (May 2003 Parkcentral Global, L.P. Confidential PPM). Moreover, Defendants point out that the opinion of Plaintiffs' damages expert describes aggregate damages for the whole class, but not a methodology for fairly apportioning this aggregate number among the individual limited partners. Defs.' Resp., App. (Dkt. No. 198) Ex. 3 at 153-54, 157 (Steinholt Dep.), Ex. 9 at 293-94 (SAP's Am. Resp. Defs.' Second Interrogs.).

As is the case for reliance, it would be speculative to ascertain what amount the putative class as a whole could have expected to receive upon redemption had its members possessed more or different information as to Parkcentral's investment strategy, given the differing redemption penalties and different risk tolerances among investors in Parkcentral. Whether the limited partners would have redeemed, rather than continued to hold, their investments in Parkcentral if they had been otherwise informed about Parkcentral's investment strategy must be determined on an individual basis, in light of the fact that some limited partners continued to view CMBS as worthwhile investments despite significant market declines, that different investors faced different penalties for redemption, and that individual risk tolerance and key strategies would likely have led to widely different decisions on retention of the investments.

While Plaintiffs' damages expert's methodology may be sound in the abstract, the differences in the limited partners' reliance on the misrepresentations or omissions, and different interests in the fact and timing of potential redemptions are an individualized issue. *O'Sullivan v.*

*Countrywide Home Loans, Inc.*, 319 F.3d 732, 744 (5th Cir. 2003) ("Where the plaintiffs'

damage claims focus almost entirely on facts and issues specific to individuals rather than the

class as a whole, the potential exists that the class action may degenerate in practice into multiple

lawsuits separately tried."); *Schafer v. State Farm Fire & Cas. Co.*, No. 06–8262, 2009 WL

2391238, at *4-5 (E.D. La. Aug. 8, 2009) (holding that "the measure of damages require[d]

individualized determinations" and plaintiffs failed to carry their burden to show that individual

damages could be determined by reference to a mathematical or formulaic calculation).

### b.    Superiority of Class Action over Individual Claims

Because Plaintiffs have not established predominance, the Court need not make a

determination as to whether Plaintiffs have met Rule 23(b)(3)'s superiority requirement.

### IV.    CONCLUSION

Joinder of individual members of the purported class is not impracticable, militating

against class certification. Further, the putative class does not meet the requirements of Rule

23(b)(1)(B), because the claims of the putative class members do not fit within one of the

historical categories of appropriate cases for class certification under the rule, and do not

constitute a limited fund case. Finally, the differences in the information and communications

sent to and received by members of the putative class, and differences in the risk tolerance and

redemption rights of members of the putative class, create individualized issues as to whether

they received false or misleading representations or omissions, the extent to which they relied on

any such misrepresentations or omissions, and what damages the individual limited partners

suffered. These differences preclude class certification under the predominance requirement of

Rule 23(b)(3).

Accordingly, Plaintiffs' Motion to Certify a Class is **DENIED**. The parties shall confer

and submit a joint status report, no later than thirty days from the date of this Order, informing

the Court whether Plaintiffs intend to proceed only with their claims, seek to join other plaintiffs, or to file an interlocutory appeal.

**SO ORDERED**.

August 25, 2014

**BARBARA M. G. LYNN**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**